UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALI MUSAID AHMED
MUTHANA,

                              Plaintiff,

v.

ELIZABETH POPIEL,

                              Defendant.

_____/

Case No. 23-12869

Jonathan J.C. Grey
United States District Judge

Curtis Ivy, Jr.
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON DEFENDANT POPIEL'S
MOTION FOR SUMMARY JUDGMENT (ECF No. 32)**

## I.    PROCEDURAL HISTORY

Pending before the Court is Defendant Elizabeth Popiel's *Motion for
Summary Judgment* (ECF No. 32).  Pro se Plaintiff Ali Musaid Ahmed Muthana,
proceeding *in forma pauperis*, is in the custody of the Michigan Department of
Corrections ("MDOC"), has sued two Woodland Center Correctional Facility
("WCC") employees for retaliation and denial of access to the courts.  The only
remaining defendant, Elizabeth Popiel, moves for summary judgment on the
retaliation claim, the remaining claim against her.[1]  (ECF No. 32).  This case was

_____

[1] Plaintiff named a violation of due process among his claims, but no allegations concern
a violation of due process. Thus, the undersigned will screen this claim under 28 U.S.C. §
1915(e)(2) and 42 U.S.C. § 1997e below.

referred to the undersigned for all pretrial matters.  (ECF No. 11).  Defendant's

motion is fully briefed and ready for report and recommendation.

For the reasons below, the undersigned **RECOMMENDS** that Defendant's

Motion for Summary Judgment be **GRANTED**.

## II.    DISPUTED AND UNDISPUTED FACTS

Plaintiff alleged three forms of retaliation in his unverified complaint: the

denial of access to legal writer assistance, destruction of his documents, and refusal

to make copies for him.[2]  Defendant was a librarian at WCC between January 3,

2023, and October 3, 2023, the period of the alleged events.

Plaintiff states that he required assistance from the legal writer because he is

mentally ill, English is his second language, and he has no schooling in the United

States.  (ECF No. 1, PageID.7, Plaintiff's Complaint).  Plaintiff says that

Defendant fired the legal writer at WCC, so when he asked to see the legal writer,

Defendant told him he needed to use a legal writer at a different prison.  He asserts

that it is against prison policy to use a legal writer from a different prison.  Even

so, he used the outside help.  Plaintiff now alleges that the legal writer refused to

help him because Defendant would not allow Plaintiff to have assistance.

---

[2] The Court can only rely on admissible evidence when evaluating a motion for summary judgment.  An unverified complaint is not admissible.  Thus, the undersigned relies on the complaint only as a source of background information for the claims addressed in the motion, not as evidence.

Plaintiff alleged that on June 5, July 16, July 18, and August 8, 2023, he gave Defendant legal documents, but she "hijack[ed]" or destroyed them in retaliation for filing lawsuits. (*Id.* at PageID.8).

And on various dates between May and August 2023, he gave Defendant legal photocopy disbursement forms, but she inappropriately refused to make the requested photocopies. (*Id.*). She allegedly told Plaintiff that the facility's budget was "not quite well." (*Id.*). She also allegedly told him that she would not make copies for him because he had filed many lawsuits against MDOC staff and "we need to stop that." (*Id.* at PageID.9).

Plaintiff attached a few documents to his response brief in support of his allegations. Six documents are purportedly signed by Defendant acknowledging that she received the listed documents from Plaintiff (these include legal documents and grievances) to be either copied or sent to a legal writer, it is unclear which. (ECF No. 34, PageID.333–38). Two documents are copies of letters from a legal writer explaining to Plaintiff why the writer was unable to assist him. (*Id.* at PageID.340–43). These letters are dated July 3, 2023, and January 5, 2024. (*Id.*). Both letters were sent in response to Defendant's requests for assistance. (*Id.*). The last document is MDOC's "Access to the Courts" policy directive. (*Id.* at PageID.345–48).

Plaintiff's deposition testimony largely reiterates what is in his complaint. He said that Defendant fired the legal writer at WCC, so he was forced to use a legal writer elsewhere even though prisoners are not permitted to do so. (ECF No. 32-5, PageID.294–95). Thus, Plaintiff says that Defendant denied him legal writer assistance.

As for not making copies of documents, Plaintiff testified that Defendant was not forthcoming about the facility's budget because it was not an issue until Defendant started working there and his copy requests were denied. (ECF No. 32-5, pageID.296). And he insisted that Defendant refused to accept the forms to make those photocopies in retaliation for filing lawsuits against MDOC and its staff. (*Id.* at PageID.297).

Plaintiff confirmed the four dates he gave Defendant documents to be copied that Defendant did not return. (*Id.* at PageID.299) (confirming June 5, July 16, July 18, and August 8, 2023). Plaintiff said he was unaware of what she did with the documents, and he could not say whether she destroyed them. (*Id.* at PageID.300).

In short, his deposition testimony confirmed his allegations except for the contention that the outside legal writer refused to help Plaintiff at Defendant's direction—the transcript excerpts do not include testimony about the legal writer declining to assist Plaintiff.

Defendant refutes much of Plaintiff's testimony in her declaration.  She says she did not deny any requests for legal writer assistance.  During January 2023, Plaintiff's request for assistance from the outside legal writer was granted.  (ECF No. 32-2, PageID.267, ¶ 5).  She recalled three occasions when she met with Plaintiff about his requests for photocopies.  Because he did not have the correct documentation and could not afford to pay for the copies himself (with the correct documentation he would have been eligible for a loan), she could not make the copies.  She gave him other options to attempt to assist him, but he refused those options.  (*Id.* at ¶ 6).

Of the four dates on which she is accused of keeping or destroying documents, she says that on July 18, 2023, she scanned Plaintiff's documents and gave them all back to him.  (*Id.* at PageID.268, ¶ 7).  She did not interact with Plaintiff on June 5 or July 16, 2023.  (*Id.* at ¶ 9).  She says she could not have signed the receipt of Plaintiff's documents on June 5 or July 16, 2023, because she was not in the building those days.  (*Id.*)  She does not recall signing a receipt on August 8, 2023, and for both of the last two dates the signature is not hers.  (*Id.* at ¶ 8).  Lastly, Defendant denies telling Plaintiff she would not make copies for him because he has filed too many lawsuits, or that she told any legal writer to stop assisting Plaintiff.  She denies ever retaliating against Plaintiff.  (*Id.* at PageID.269).

Defendant emailed other prison staff after her encounters with Plaintiff about legal writing materials and his photocopy requests.  (ECF No. 32-7).  For example, she sent an email on July 19, 2023, about an encounter the day before. She wrote that she met with Plaintiff on July 18th and picked up a few documents. She scanned the documents and returned them to Plaintiff; Plaintiff signed for both pickup and receipt of the documents.  (*Id.* at PageID.317).  July 18, 2023, is one of the days Plaintiff says Defendant took his documents and never returned them. That said, there is no document in the record bearing Plaintiff's signature confirming receipt of these documents, but the facility's logbook indicates that the documents were returned.  (ECF No. 32-8, PageID.319–20).

Brian Smith, the Librarian Manager at the Chippewa Correctional Facility ("URF"), submitted a declaration.  He said that between January and October 2023, the Chippewa Facility's legal writer program was assisting WCC's prisoners because WCC did not have a legal writer.  (ECF No. 32-4, PageID.284, ¶ 4).  He said that Defendant Popiel did not have supervisory authority over the legal writers at Chippewa.  (*Id.* at ¶ 5).  Prisoner Willis, an assigned legal writer, signed one of the two letters denying Plaintiff legal writer services that Plaintiff attached to his response.  (ECF No. 34, PageID.342).  Brian Smith said that Willis would only stop working with a "client" if the client failed to meet the criteria for assistance

and that Willis does not take direction from WCC staff.  (ECF No. 32-4, PageID.284, ¶¶ 5–7).

## III.   ANALYSIS AND RECOMMENDATIONS

### A.   Governing Standards

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ."  *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for purposes of the motion").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citation omitted).  In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

That Plaintiff is *pro se* does not reduce the obligations under Rule 56. Rather, "liberal treatment of *pro se* pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006).  "Once a case has progressed to the summary judgment stage, . . . 'the liberal pleading standards under *Swierkiewicz [v. Sorema, N.A.*, 534 U.S. 506, 512–13 (2002)] and [the Federal Rules] are inapplicable.'" *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

**B.      Discussion**

1.      Due Process

At the beginning of Plaintiff's complaint, he needed to explain the basis for

this Court's jurisdiction.  He wrote that Defendants violated the First Amendment

and that both Defendants deprived him of due process in violation of the

Fourteenth Amendment.  (ECF No. 1, PageID.4).  This appears to be the only time

Plaintiff mentions the Fourteenth Amendment or due process in his complaint.

The Court must consider the viability of the claims under 28 U.S.C. §

1915(e) and 42 U.S.C. § 1997e.  These statutes require courts to dismiss actions

filed by prisoners and persons proceeding *in forma pauperis* that fail to state a

claim on which relief can be granted.  The dismissal standard of Federal Rule of

Civil Procedure 12(b)(6) described in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544

(2007), governs whether Plaintiff states a plausible claim for relief under §

1915(e)(2).  *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010).  "[A] complaint

must contain sufficient factual matter, accepted as true, to state a claim to relief

that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal

quotation omitted); *see also Bell Atl. Corp.*, 550 U.S. at 555 (concluding that a

plausible claim need not contain "detailed factual allegations," but it must contain

more than "labels and conclusions" or "a formulaic recitation of the elements of a

cause of action").  Facial plausibility is established "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

It is unclear whether Plaintiff's cursory mention of a due process violation is

meant to be procedural or substantive due process.  Either way, the allegations that

came after the "basis of jurisdiction" section concern only First Amendment

retaliation and access to the courts.  The allegations do not suggest, for instance,

that Plaintiff's life, liberty, or property interests were deprived of without adequate

procedural safeguards, *see Cooperrider v. Woods*, 127 F.4th 1019, 1042 (6th Cir.

2025), or that a fundamental right was violated or Defendants' conduct "shocks the

conscience of the court."  *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1077

(S.D. Ohio 2017) (citation omitted).  As plead, the due process claim fails to

satisfy pleading standards under Rule 8, *e.g.*, Plaintiff fails to provide a short and

plain statement showing that he is entitled to relief on such a claim.  Since there are

no allegations to state a claim for violation of either procedural or substantive due

process, this claim (if Plaintiff truly intended to raise it) should be dismissed.

### 2.    Retaliation

Defendant argues that Plaintiff's First Amendment claims fail because there

was no adverse action and because she had a non-retaliatory reason for the

challenged conduct.

10

Before addressing the merits of his claims, Plaintiff's response begins with two evidentiary quarrels. Plaintiff first asserts that Defendant used his deposition transcript against him yet only provided the Court excerpts of the transcript. He says that Defendant provided what she could use against him but did not produce all the questions and answers. Plaintiff contacted the reporting agency to get a copy of the transcript, but his request went unanswered. (ECF No. 34, PageID.324).

No rule requires parties to submit a complete transcript. It was not inappropriate for Defendant to provide only the excerpts of Plaintiff's deposition she relied on in her argument. While Plaintiff notes that only part of the transcript was submitted, he does not suggest that Defendant mischaracterized his testimony. Plaintiff also requested that the Court obtain a copy of the transcript. (*Id.*). Pursuant to Federal Rule of Civil Procedure 30(f)(3), "[w]hen paid reasonable charges, the [court reporter before whom the deposition was taken] must furnish a copy of the transcript or recording to any party or the deponent." Fed. R. Civ. P. 30(f)(3). Thus, the "general rule, established expressly by the Federal Rules of Civil Procedure, is that a party must obtain copies of deposition transcripts directly from the court reporter upon the payment of a reasonable charge, and not from opposing counsel or the court." *Watson v. Ohio Ambulance Sols., LLC*, No. 1:20-CV-802, 2022 WL 2133739, at *3 (S.D. Ohio June 14, 2022) (quoting *Schroer v.*

11

*United States*, 250 F.R.D. 531, 537 (D. Colo. 2008)).  Plaintiff was provided the information to obtain his deposition transcripts, and the fact that Plaintiff did not get a copy of his transcript was not an issue he raised before the Court.  (*See* ECF No. 32-5, PageID.302).

Plaintiff next asserts that Defendant was untruthful in her declaration.  (ECF No. 34, PageID.325).  In her declaration, she says that she could not have signed the document receipt attached to Plaintiff's complaint at Exhibit L-1 on July 16, 2023, because she was not in the facility on that date.  (ECF No. 32-2, PageID.268, ¶ 8).  But the document at Exhibit L-1 appears to be dated February 16, 2023, not July 16th.  (ECF No. 1, PageID.61).  And the signature on the three receipts at Exhibit L are all different.  (ECF No. 34, PageID.325).  So he suggests that Defendant signed all three receipts contrary to what she says in her declaration.

The undersigned agrees that there is a discrepancy between Defendant's declaration and the receipt at Exhibit L-1—it appears to be dated February 16, not July 16.  This dispute is not material to the outcome here.  Even if Defendant had signed that February 16, 2023, receipt for documents, that receipt is immaterial to Plaintiff's claims because he alleged and confirmed at his deposition that Defendant failed to return his documents four times, and February 2023 is not near any of those four dates.  (*See* ECF No. 32-5, PageID.298).  Plaintiff cannot claim additional instances of retaliatory conduct in response to a motion for summary

judgment.  Nor does the undersigned view the discrepancy in Defendant's

declaration to mean that the rest of the declaration must be disregarded.

Neither of Plaintiff's evidentiary issues impact the merits of Defendant's

motion or this Court's ability to rule on that motion.

As for the merits, Plaintiff's response brief recites the facts and positions he

took in his complaint, i.e., Defendant denied him access to a legal writer, kept or

destroyed his documents, and refused to make copies in retaliation for his lawsuits.

(ECF No. 34, PageID.325–28).

A retaliation claim has three elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action
> was taken against the plaintiff that would deter a person of ordinary
> firmness from continuing to engage in that conduct; and (3) there is a
> causal connection between elements one and two—that is, the adverse
> action was motivated at least in part by the plaintiff's protected
> conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (internal citations

omitted).  Defendant does not contest the first element.

An adverse action is one that would "deter a person of ordinary firmness

from engaging in protected conduct."  *Siggers-El v. Barlow*, 412 F.3d 693,

701 (6th Cir. 2005).  "*Actual* deterrence need not be shown."  *Harbin-Bey v.

Rutter*, 420 F.3d 571, 579 (6th Cir. 2005) (emphasis original) (citing *Bell v.

Johnson*, 308 F.3d 594, 606 (6th Cir.2002)).  "[T]his element is not an overly

difficult one for the plaintiff to meet."  *Hill*, 630 F.3d at 472.  Consequently,

"unless the claimed retaliatory action is truly inconsequential, the plaintiff's claim should go to the jury." *Bell*, 308 F.3d at 603 (citation and internal quotation marks omitted).

"Under the third element, the subjective motivation of the defendants is at issue." *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018) (citation omitted). But if the prison official can show that the action would have occurred even if the plaintiff had not engaged in protected activity, there is an absence of "but for" causation and there is no valid claim of retaliation. *See Good v. Walworth*, No. 21-1429, 2023 WL 9320823, at *3 (6th Cir. Aug. 22, 2023). A plaintiff's subjective belief that he has been retaliated against is insufficient to withstand summary judgment. *Green v. Cent. Ohio Transit Auth.*, 647 F. App'x 555, 561 (6th Cir. 2016).

### a.   *Legal Writer Assistance*

Defendant contends that Plaintiff did not suffer adverse action with respect to the legal writer program because the evidence does not support the notion that she denied him access to a legal writer and asserts that there were non-retaliatory reasons behind any decisions that were made.

During his March 15, 2025, deposition, Plaintiff said that he filed his initial grievance in November or December of 2022 because there was no legal writer at WCC. (ECF No. 32-5, PageID.294). He stated that Defendant is the legal writer's

supervisor, and that she fired the legal writer at WCC and "forced" Plaintiff to use the legal writer in another prison, who he was unable to directly communicate with. (*Id.* at PageID.294–95). He claimed it is against MDOC policy to use a legal writer in another prison who is not present to assist him. (*Id.*). Plaintiff asserted that prisoners have a right to access the courts, the law library, and a legal writer. (*Id.* PageID.294–95). Thus, Plaintiff asserted that Defendant denied him legal writer assistance.

To begin, there is no requirement that every prison facility within the MDOC have a legal writer. Legal writers are prisoners who complete the legal writer training program and are assigned as legal writers at MDOC facilities. (ECF No. 32-3, PageID.280, Policy Directive 05.03.116 ¶ S). But the Policy Directive concerning legal writers does not say that every MDOC facility must have a legal writer. Instead, language in the policy expressly contemplates the possibility of a facility not having a legal writer. The Policy Directive provides that, "[i]f the facility does not have an on-site Legal Writer Program, the prisoner may be transferred to a facility that does have an on-site program." (*Id.* at PageID.281, ¶ U). Since the prisoner "may be transferred," transfer is discretionary under this policy. The policy does not prohibit a prisoner housed in a facility without a legal writer from using a legal writer at a different facility. Indeed, Plaintiff mentioned

using the legal writer at URF on at least one occasion without issue.  (*See* ECF No. 1, PageID.7).

There is no evidence that Defendant was involved in hiring decisions that resulted in Plaintiff's prison not having its own legal writer.  Thus, the lack of a legal writer at WCC could not be attributed to Defendant or considered to be adverse action from Defendant.  Nor is there evidence showing that Defendant prevented Plaintiff from using the services of an outside legal writer, told a legal writer not to help him, or had authority to direct such action.

Plaintiff has submitted no evidence to support his conclusory claim that Defendant told the outside legal writer to stop assisting Plaintiff with his filings or that Defendant sat in a supervisory or authority position over the legal writer to direct such action.  MDOC policy reflects that the Legal Writer Program is "provided through prisoners at the institution who have successfully completed the legal writer training program and are assigned by the facility as legal writers." (*See* ECF No. 32-3, PageID.280).  MDOC policy also states that eligibility for use of the Legal Writer Program shall be screened by a staff member selected by the Warden, but the record does not reflect that Defendant served in this capacity.  (*Id.* at PageID.281).  The evidence only reflects that Defendant has served as a liaison with the legal writer at URF to transfer necessary documents from WCC prisoners to the legal writer at the outside facility.

Defendant submitted a sworn declaration that states that Plaintiff requested and was approved for legal writer assistance in January 2023, and that as part of her duties as a law librarian at WCC, she scanned legal documents for Plaintiff and sent them to the Legal Writer Program at URF.  (ECF No. 32-2, PageID.267). Defendant also stated that she never forced Plaintiff to use the URF Legal Writer Program, she did not have any supervisory capacity over the legal writers at URF, and at no time did she direct the legal writers to stop assisting Plaintiff.  (*Id.* at PageID.269).

Similarly, Brian R. Smith, the Librarian Manager at URF, submitted an affidavit reflecting that he supervised the legal writers in URF's Legal Writer Program.  (ECF No. 32-4, PageID.283–84).  Mr. Smith stated that URF assisted WCC at the time because WCC did not have a legal writer, but WCC librarians and staff did not have supervisory capacity over the URF legal writers, including those who assisted Plaintiff.  (*Id.* at PageID.284).  Mr. Smith further noted that he never observed Defendant tell a URF legal writer to stop assisting Plaintiff, nor do the URF legal writers take directions from WCC staff.  (*Id.*).  Mr. Smith stated that the legal writers would only stop working with a "client" if the client failed to meet the criteria for assistance.  (*Id.*).

In fact, the record contains three letters from the outside legal writers regarding Plaintiff's claim(s).  On January 20, 2023, the Legal Writer Program at

URF, sent Plaintiff a letter confirming its receipt of Plaintiff's file and request for assistance with a motion and a previously filed 42 U.S.C. § 1983 complaint.  (ECF No. 32-2, PageID.272).  The letter indicated that assistance will be offered and requested additional details and evidence from Plaintiff to substantiate his claim and support his motion, such as a clear statement of his issues, any transcripts or documents to support the issues raised, any recent orders of the court, and the briefing schedule.  (*Id.*)

On July 3, 2023, one of the outside legal writers responded to an unknown correspondence from Plaintiff and stated: "Mr. Muthana, yes you are ***eligible*** for legal writer assistance, however, there seems to be some misunderstanding on exactly what that means."  (ECF No. 1, PageID.58) (emphasis added).  The outside legal writer emphasized that all WCC prisoners are ***eligible*** for legal writer assistance, but all have not been ***approved***, and cited MDOC policy that states "***[o]nly prisoners*** *not represented by counsel* ***who are unable to effectively help themselves*** *by using the law library or other available legal resources are eligible to receive Legal Writer Program services*."  (*Id.*) (emphasis in original).  The outside legal writer emphasized the MDOC policy that states that "[t]he Legal Writer Program does not operate as a 'typing service.'"  (*Id.*)  After review of the materials Plaintiff submitted, the outside legal writer determined that Plaintiff's hand-written 42 U.S.C. § 1983 complaint was "very detailed, extensive, and

complete", thus, due to the depth of Plaintiff's submissions he was "more than able to <u>effectively help [him]self</u>," and apologized that he was unable to provide the service, *i.e.* typing, that Plaintiff requested.  (*Id.*) (emphasis in original).

On January 5, 2024, another outside legal writer sent Plaintiff a correspondence indicating that they could not assist Plaintiff any further with one of his cases due to his refusal to provide evidence of the defendant's culpability. (ECF No. 34, PageID.340).  The legal writer noted that the Legal Writer Program is not a typewriting service, and Plaintiff was "demanding that the legal writer type all of the kites" that he had sent to the service.  (*Id.*).  The legal writer further explained that they have reviewed all documents provided by Plaintiff, the defendant's motion for summary judgment, the defendant's responses to Plaintiff's motions, and found that Plaintiff had "a problem with material factual disputes. Without factual evidence to back up [Plaintiff's] claims, [his] claims become frivolous, and [the Legal Writer Program] cannot assist with frivolous claims." (*Id.*).  Based upon the materials Plaintiff had submitted and the depth of his requests, the legal writer also found that Plaintiff was "more than able to <u>effectively help [himself], and we cannot assist you</u>."  (*Id.* at PageID.341) (emphasis in original).

Defendant submitted a July 13, 2023, email indicating that on July 11, 2023, Plaintiff declined to provide evidence needed for the legal writer to be able to

accept his case, but she had the legal writer draft a memorandum requesting the

evidence from Plaintiff so that it was communicated both orally and in writing.

(ECF No. 32-7, PageID.314).  On July 13, 2023, Defendant indicates that, while

returning the written statements to Plaintiff, she also delivered the memorandum

from the legal writer.  (*Id.*)  Plaintiff declined to send the documents requested by

the legal writer, so she left him a document receipt to complete when he was ready.

(*Id.*)

Plaintiff attempts to rebut this by stating that he had used the Legal Writer

Program in the past and that the first time he was "denied," despite still meeting

the eligibility requirements, was after Defendant began working at WCC.  (*See*

ECF No. 34, PageID.326–27).  He further stated that he was "forced" to file his

complaint to the court on his own despite not knowing anything about the law.  (*Id.*

at PageID.328).  Plaintiff also asserts that Defendant and defense counsel lied in

the brief and declaration in support of the motion for summary judgment and re-

alleges that Defendant denied him legal writer assistance and cited to the letters

discussed above.  (*Id.* at PageID.323–24, 326).

Plaintiff cannot meet the third element of his retaliation claim.[3]  To succeed

on this element, Plaintiff must allege facts sufficient to infer that he would not have

been denied assistance from the Legal Writing Program had he not filed his

---

[3] The undersigned will not address whether the second element was established.

previous grievances and/or lawsuits against MDOC and its employees.  Plaintiff's

allegations are far too conclusory to meet this requirement.  Plaintiff has not

alleged or provided evidence to show that Defendant participated in the hiring or

firing decisions that resulted in WCC not having its own legal writer, or that

Defendant sat in a supervisory or authoritative position over the Legal Writer

Program at URF to direct or influence the outside legal writers to refuse to assist

Plaintiff.  In fact, the record contains three letters that indicate the outside legal

writers received Plaintiff's requests for assistances and provided a non-retaliatory

reason as to why they could not assist Plaintiff in those particular instances.  In

these letters, the legal writers—in accordance with MDOC policy—clarified that

Plaintiff, while *eligible* for the Legal Writer Program, was not *approved* for the

Program since a review of Plaintiff's submissions reflected his ability to effectively

help himself with the resources available in the law library without further

assistance.  Specifically, in July 2023 and January 2024, the legal writer reviewed

Plaintiff's submissions and found that his hand-written submissions were very

detailed, extensive, and complete, showing that Plaintiff was effectively able to

help himself with the assistance of the legal resources available in the law library,

and they denied Plaintiff's request that the Legal Writer Program in essence serves

as a typing service.

The evidence reflects non-retaliatory reasons why Plaintiff was denied assistance from the Legal Writer Program, and Plaintiff is unable to show that Defendant directed the legal writers' findings or that Plaintiff was denied assistance *because of his filed grievances and/or lawsuits*.  "[C]onclusory allegations of retaliatory motive 'unsupported by material facts'" are not enough.  *Newsome v. Streeter*, No. 18-3927, 2019 WL 4842955, at *3 (6th Cir. July 3, 2019) (quoting *Harbin-Bey*, 420 F.3d at 580); *see also Alexander*, 576 F.3d at 560 ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment.").  While pro se pleadings are entitled to liberal construction, that does not extend to creating factual allegations where none exist.

In this case, Plaintiff has not come forward with any persuasive proof of a causal connection between his filed grievances and/or lawsuits and him being denied assistance by the Legal Writer Program.  Rather, Plaintiff relies solely on his speculation and his own subjective belief that such a causal connection exists. This is not sufficient to withstand summary judgment.  Accordingly, summary judgment for Defendant on Plaintiff's retaliation claim is appropriate.

### b.    *Destroying Documents*

Defendant contends that Plaintiff did not suffer adverse action with respect to his legal documents because the evidence does not support the notion that

Defendant destroyed any of Plaintiff's documents or did so in retaliation for filing

grievances and/or lawsuits.

Plaintiff alleges that on June 5, July 16, July 18, and August 8, 2023, he

gave Defendant legal documents, but she never returned them; Plaintiff also stated

she "hijacked" or destroyed them in retaliation for filing lawsuits.  (ECF No. 1,

PageID.8).  During his May 15, 2025, deposition, Plaintiff reiterated that he gave

Defendant documents on those four dates to be copied and returned, but they were

not returned.  (ECF No. 32-5, PageID.298–99) (confirming June 5, July 16, July

18, and August 8, 2023).  He further said he did not know what Defendant did with

the documents; he could not say whether she destroyed them, only that he did not

get them back.  (*Id.* at PageID.300).  Plaintiff stated that when he confronted

Defendant for the return of his documents, she told him they were for the legal

writer, and he protested that the legal writer cannot keep his documents either.  (*Id.*

at PageID.301).

Defendant submitted a signed declaration indicating that on July 18, 2023, in

the performance of her duties as a librarian, she assisted Plaintiff with scanning

legal documents to send to the URF legal writer.  (ECF No. 32-2, PageID.268).

She said she went to Plaintiff's cell, picked up documents that he wanted sent to

the outside legal writer, scanned the documents, and returned the documents to

Plaintiff.  She stated that she sent an email on July 19, 2023, to four MDOC

employees summarizing the July 18, 2023, interaction.  (*Id.*)  Indeed, Defendant

submitted copy of the July 19, 2023, email indicating that she saw Plaintiff, with

CMO Bejarano present, and that she picked up, scanned, and returned documents,

and had attached the scans to the email for use by the outside legal writer.  (ECF

No. 32-7, PageID.317).  And Defendant submitted the logbook for July 18, 2023,

which reflects that she received documents from Plaintiff at "1452," and returned

them at "1633."  (ECF No. 32-8, PageID.319–20) (referencing military time).

Defendant also stated that she did not have interactions with Plaintiff on

June 5, 2023, or July 16, 2023, as she was not at the facility on those dates.  (ECF

No. 32-2, PageID.268).  Defendant submitted her timesheets for those dates which

reflect that she was not scheduled to work on those dates.  (*Id.* at PageID.274–75).

Similarly, she noted that she does not recall signing the August 8, 2023, receipt

submitted by Plaintiff, and noted that neither the July 16, 2023, or August 8, 2023,

receipts contain her handwriting in either the signature or date lines.  (*Id.* at

PageID.268).  Defendant reiterated that "[a]t no time, did I 'hijack,' destroy, or

intentionally throw away Muthana's documents."  (*Id.* at 269).

Defendant submitted a July 13, 2023, email indicating that earlier that day

she returned Plaintiff's written statements to him, and he signed for receipt, and

that she also delivered a memorandum from the legal writer.  (ECF No. 32-7,

PageID.314).

Plaintiff attempts to rebut this by accusing Defendant and defense counsel of falsifying or lying in the brief and declaration in support of the motion for summary judgment; specifically, he claims she did sign the receipt forms and that although her handwriting is different on all three of the forms submitted, they are in fact hers.  (ECF No. 34, PageID.323–26).

Plaintiff submitted a June 11, 2023, MDOC Prisoner/Parolee Grievance Form (Grievance Form) against Plaintiff.  (ECF No. 1, PageID.36).  There, he stated that on May 30, 2023, he provided legal documents to PC Salaam and Defendant to be scanned and sent to the outside legal writer, but his documents were never returned to him.  (*Id.*).  Upon requesting his documents back, Defendant told him they are for the legal writer to use, and he cannot get them back.  (*Id.*).  Plaintiff accuses Defendant of "hijacking" his documents.  (*Id.*).

On June 29, 2023, R. Thompsons, a prison counselor, completed a Step I Grievance Response Supplemental Form, following his investigation of Plaintiff's grievance.  (ECF No. 1, PageID.37).  Defendant submitted a June 1, 2023, email sent to the deputy warden and the administrative assistant indicating that Plaintiff refused to return or exchange law library materials, and he refused the return of his materials from the Legal Writer Program.  (*Id.*).  Plaintiff was interviewed and complained that the prison counselor conducting the investigation was not Defendant's supervisor and should not review the grievance but did ultimately

state that he "gave Salaam 12 pages of papers to give to [Defendant]" and he had

not gotten them back.  (*Id.*).  The Decision Summary reflected that Defendant

sought to exchange materials with Plaintiff and he refused to exchange the legal

research materials in his possession for the requested legal research materials and

the materials generated by the Legal Writer Program.  (*Id.*).  It was decided that

Defendant fulfilled her duties in providing access to the courts pursuant to

applicable policies, as she attempted give him the product of the legal writer and

research materials, but Plaintiff refused to exchange for them; therefore, the

grievance was denied.  (*Id.*) (citing WP OP 05.05.115, "requested items shall be

delivered to the prisoner. . . unless the prisoner does not return all items previously

delivered to them [. . .].").

Plaintiff appealed the decision and provided a statement in support of his

Step II appeal that reiterated that he provided 12 pages of documents on May 30,

2023, and Defendant "highjacked" them by refusing to return them and stating they

are for the legal writer to use.  (ECF No. 1, PageID.38).  He also stated that

Defendant lied about offering his materials from the legal writer program.  (*Id.* at

PageID.40).  He stated Defendant approached him while he was in the "Day

Room" and asked if he would return the materials that he currently had, but he

declined and told her that he still needed those materials until he filed his

grievance, and she walked away.  (*Id.*).  The decision was upheld.  (*Id.* at PageID.39).

In his May 15, 2025, deposition, Plaintiff testified that on June 5, 2023, July 16, 2023, July 18, 2023, and August 8, 2023, he gave legal documents, such as grievances and handwritten documents, to Defendant and she never returned his documents.  (ECF No. 32-5, PageID.298–300).  Plaintiff testified that he requested his documents be returned and Defendant would tell him that she planned to bring them back or that they were for the legal writer.  (*Id.* at PageID.300–01).  Plaintiff stated that he believes Defendant destroyed his documents or "threw them away," but then conveyed that "[o]r I don't know what she done [sic] with them," just that she never gave the documents back to him.  (*Id.*).

Plaintiff has not submitted enough evidence, aside from his suspicion, for a reasonable jury to conclude that Defendant destroyed Plaintiff's legal documents, such that Defendant could be liable for retaliation because of Plaintiff's complaints or grievances.  Plaintiff testified during his deposition that he does not know if Defendant actually destroyed his documents, only that they had not been returned to him.  He further testified when he requested that his documents be returned, Defendant indicated that she provided them to the legal writer, which was at the request of Plaintiff, and would return them later.  Importantly, Plaintiff's deposition testimony does not indicate that Defendant destroyed his document in

retaliation for filing complaints or grievances, only that she provided his documents to the legal writer, and she never returned them, so he assumes that she destroyed his documents.  *See Green*, 647 F. App'x at 561 (finding that a plaintiff's subjective belief that he has been retaliated against is not sufficient to avoid summary judgment).  The record also reflects that Defendant was not at the facility on June 5, 2023, or July 16, 2023; that neither the July 16, 2023, or August 8, 2023, receipts contain Defendant's handwriting in either the signature or date lines; and that as to July 18, 2023, the log shows that Defendant picked up documents from Plaintiff at "1452" and returned them at "1633," and Defendant sent a July 19, 2023, follow-up email recounting the interaction.  (ECF Nos. 32-7, PageID.317; 32-8, PageID.319).  Finally, the record reflects that during the investigation into Plaintiff's grievances, it was found that on at least one date attempts had been made to exchange materials with Plaintiff, but he refused to exchange the legal research materials in his possession for the requested legal research materials and materials generated by the Legal Writer Program because he still needed the legal research materials in his possession while drafting additionally grievances.  (*See* ECF No. 1, PageID.38–39).

"To survive a summary judgment motion, a plaintiff must put forward more than speculations or intuitions," and here, Plaintiff has been unable to do so.  *See*

*Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007) (citing

*Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002)).

Accordingly, the Court finds that Plaintiff has not submitted enough

evidence, aside from his conclusory allegations, for a reasonable jury to conclude

that Defendant not returning documents to Plaintiff amounted to an adverse action

that would deter a person of ordinary firmness from continuing to engage in the

protected conduct or a causal connection between his filed grievances and/or

lawsuits and his documents allegedly not being returned.  Rather, Plaintiff relies

solely on his speculation and his own subjective belief that such a causal

connection exists.  This is not sufficient to withstand summary judgment.

Accordingly, summary judgment for Defendant on Plaintiff's retaliation claim is

appropriate.

### c.    Refusing to Make Copies

Defendant contends that Plaintiff did not suffer adverse action with respect

to his requests for copies because the evidence shows that there were legitimate

reasons that requested copies could not be made, nor did Defendant refuse to make

copies in retaliation for filing grievances and/or lawsuits.

Plaintiff alleges that on multiple dates he provided Defendant with a legal

photocopy disbursement form with files he was requesting to be copied, and

Defendant refused to accept the disbursement forms or make copies for him.  (ECF

No. 1, PageID.8).  Plaintiff stated that Defendant has provided various reasons for

rejecting his requests for photocopies to include that she was unable to make

copies because the facility's budget was not doing well, that the legal writer did not

request the copies, that he needed a Court order requesting the copies, and that he

has filed too many lawsuits against MDOC and its staff and that he needed to stop.

(*Id.* at PageID.8–9).

Defendant submitted a signed declaration indicating that on June 20, July 5,

and August 10, 2023, in the performance of her duties as a librarian, she met with

Plaintiff at his cell regarding his request for photocopies.  (ECF No. 32-2,

PageID.267).  She stated that Plaintiff failed to present the correct documentation

needed for photocopies, particularly the document needed to request a loan as he

lacked sufficient funds to cover his requested photocopies.  (*Id.*).  Defendant

discussed all of Plaintiff's options to properly request photocopies and he declined

all options presented; she later emailed MDOC staff outlining the interaction.  (*Id.*;

ECF No. 32-7, PageID.313).  Defendant reiterated that "[a]t no time, did I say, 'I

am not gonna make for you any copies you have filed many lawsuits against the

MDOC staff and we need to stop that,' nor do I take issue with Muthana's, or any

prisoner's right to file lawsuits."  (ECF No. 32-2, PageID.269).

In a July 13, 2023, email, Defendant indicated that she conducted law library

rounds with CMOs Martin and Godin present, and Plaintiff "demanded copies of

handwritten documents submitted for review to the Legal Writers Program."  (ECF No. 32-7, PageID.314).  Defendant stated that she reminded Plaintiff that he must make a personal copy before sending any documents out to the legal writer as it was not the responsibility of the law librarian or the legal writer to make copies of his handwritten documents without valid proof of requirement per MDOC Policy Directive 05.03.116.  (*Id.*).

In a June 20, 2023, email, Defendant summarized her meeting with Plaintiff regarding photocopies of records he would like to include in his court filings that were not submitted with any of his requests to the Legal Writer Program.  (ECF No. 32-7, PageID.315).  Plaintiff did not have funds to purchase legal photocopies and was not eligible for a loan without proper documentation requesting a loan, which she stated that he had been advised of several times.  (*Id.*).  Plaintiff refused to give Defendant his legal documents for review to determine whether they were eligible for copies unless she agreed to photocopy the documents "sight unseen." (*Id.*).  Defendant instructed Plaintiff that, per MDOC Policy Directive 05.03.116, he must show proof of a required need as none of the documents were previously labeled as exhibits or cited in the complaint completed by the Legal Writer Program.  (ECF No. 32-7, PageID.313–14).  She further explained that any Step III Grievances would be eligible for copies per the Office of Legal Affairs, but the other documents would require additional information to show that they qualify for

additional copies.  (ECF No. 32-7, PageID.314).  Plaintiff refused to show
documentation or allow her to escalate the issue.  (*Id.*).

In an August 10, 2023, email, Defendant indicated that she conducted law
library rounds earlier that day with CMOs Bejarano and Deroche present and
received a call that Plaintiff needed assistance with meeting a deadline in a court
order.  (ECF No. 32-7, PageID.313).  Upon meeting with Plaintiff, he returned
some law library materials and showed Defendant a court order for medical
records and requested that a copy of the order to give to the medical records
department so he could retain the original.  (*Id.*).  Defendant stated that Plaintiff
"did not show any proof of requirement or court document that showed that this
order would require the state to make a copy of the order, nor the medical records";
consequently, Plaintiff refused to give her the order or disbursement form until
Defendant agreed in advance to make photocopies for him.  (*Id.*).  Defendant
provided three options to Plaintiff to obtain photocopies: 1) send the original order
to the medical records department and request they make a copy and return the
original; 2) she signs for receipt of the order to scan and send it off to request
authorization for a copy from the Office of Legal Affairs, and then return the
original to Plaintiff; or 3) request a copy as part of a filing and showing proof of
necessity per MDOC Policy Directive 05.03.116.  (*Id.*).  Defendant also stated that
Plaintiff did not offer or give a completed CSJ-602 Legal Photocopy Disbursement

form to sign, and he declined all three options that were provided to resolve his issue.  (*Id.*).

Plaintiff attempts to rebut this evidence by alleging that Defendant lied in her declaration and simply reiterating the claims made in his Complaint.  (ECF No. 34, PageID.327).  Plaintiff asserts that Defendant refused to accept the disbursement forms he tried to provide, and she refused to sign and date the forms that would otherwise provide him proof that his copies were denied.  (*Id.*).

During his May 15, 2025, deposition, Plaintiff testified that Defendant claimed he was being denied photocopies because of WCC's budget, but he asserted that she was lying because WCC's budget was "good" as they received federal and state funding.  (ECF No. 32-5, PageID.296).  He also indicated that he had been incarcerated at WCC for eighteen years and he was not previously denied photocopies by the previous law librarians or legal assistants because he is an indigent prisoner, but Defendant always has excuses as to why she will not make photocopies for him.  (*Id.*).

Plaintiff does not adequately allege that Defendant's denial of photocopies amounted to adverse action.  The Sixth Circuit has held that isolated incidents of refusing photocopies of a prisoner's documents is "not likely to deter a person of ordinary firmness from pressing on with his lawsuit." *Smith v. Yarrow*, 78 F. App'x 529, 541 (6th Cir. 2003).  Plaintiff alleges three specific dates in which

Defendant allegedly refused to make copies of his legal documents, although he alleges generally that there were other incidents that also occurred.  This does not amount to a systemic denial of providing photocopies of his legal documents for filing with the courts.  Indeed, Plaintiff stated that Defendant's denial of assistance "forced me to file all my Complaint [sic] to the Federal Court myself"; thus, not only would a person of ordinary firmness not be deterred from pursuing their legal action, but Plaintiff was also not deterred.  (ECF No. 34, PageID.327).

Similarly, Plaintiff has presented no evidence to support his conclusory assertion that Defendant denied the photocopies because Plaintiff had exercised his First Amendment rights.  *See Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)) ("[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state ... a claim under § 1983.'"); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998)) ("[B]are allegations of malice on the defendants' parts are not enough to establish retaliation claims.")).  Significantly, the evidence reflects non-retaliatory reasons why Plaintiff was denied photocopies, and Plaintiff's evidence is insufficient to demonstrate that Defendant's refusal to provide the copies was motivated by Plaintiff's protected conduct.  Defendant submitted multiple emails sent in close proximity to the corresponding dates of interaction with Plaintiff and his consistent failure to follow

MDOC policy related to providing proof of requirement for copies, such as those required by the courts or at the request of the Legal Writer Program; to pay for any personal copies requested; or to provide proper documentation to request disbursement of a loan for the copies requested.  Accordingly, the Court finds that Plaintiff has not submitted enough evidence, aside from his conclusory allegations, for a reasonable jury to conclude that Defendant refused to make photocopies for Plaintiff, such that Defendant could be liable for retaliation because of Plaintiff's grievances and or lawsuits.

In this case, Plaintiff has not come forward with any persuasive proof of a causal connection between his filed grievances and/or lawsuits and him being denied photocopies.  Rather, Plaintiff relies solely on his speculation and his own subjective belief that such a causal connection exists.  This is not sufficient to withstand summary judgment.  Accordingly, summary judgment for Defendant on Plaintiff's retaliation claim is appropriate.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that Defendant's *Motion for Summary Judgment* (ECF No. 32) be **GRANTED**.

The parties here may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Hum. Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections that raise some issues

but fail to raise others with specificity will not preserve all the objections a party

might have to this Report and Recommendation.  *Willis v. Sec'y of Health and*

*Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Tchrs.*

*Loc. 231, Am. Fed'n of Tchrs., AFL-CIO*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Pursuant to Local Rule 72.1(d)(2), any objections must be served on this

Magistrate Judge.

     Any objections must be labeled as "Objection No. 1," "Objection No. 2,"

etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2), Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the

same order, and labeled as "Response to Objection No. 1," "Response to Objection

No. 2," etc.  If the Court determines that any objections lack merit, it may rule

without awaiting the response.

     Date:  December 16, 2025.         <u>s/Curtis Ivy, Jr.</u>
                                      Curtis Ivy, Jr.
                                      United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that this document was served on counsel of record and any unrepresented parties via the Court's ECF System or by First Class U.S. mail on December 16, 2025.

s/Sara Krause<br>
Case Manager<br>
(810) 341-7850